**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

GLENEL BOWDEN,

                Plaintiff,

vs.                              Case No. 3:06-cv-141-J-32JRK

CITY OF LAKE CITY, a Florida
Municipal Corporation, and DAVID
ALLBRITTON, in his individual capacity,

                Defendants.

_____

**ORDER[1]**

## I.    BACKGROUND

This is a section 1983 case filed by plaintiff Glenel Bowden against the City of

Lake City ("Lake City") and its Chief of Police, David Allbritton ("Chief Allbritton"),

alleging that Lake City and Chief Allbritton violated Bowden's constitutional rights by

selectively enforcing a city ordinance against him based on his race (African

American) and the content of handbills he was posting on utility and telephone polls

(the promotion of a National Association for the Advancement of Colored People rally

protesting the inclusion of the Confederate flag in the Lake City seal).  The Third

_____

[1]    Under the E-Government Act of 2002, this is a written opinion and therefore is available electronically.  However, it has been entered only to decide the motion or matter addressed herein and is not intended for official publication or to serve as precedent.

Amended Complaint (Doc. 24) alleges the following five counts: 1) Violation of Free Speech and Association by Selective Enforcement of City Ordinance Based on Content of Speech against Lake City (Count I) and against Allbritton in his individual capacity (Count II); 2) Racially Selective Enforcement of City Ordinance against Lake City (Count III) and against Allbritton in his individual capacity (Count IV); and 3) State Law Claims of false imprisonment and malicious prosecution against Lake City (Count V).

### A.    Facts Leading to Arrest

The summary judgment facts are as follows.  Glenel Bowden is an African American male who served for sixteen years (1982-1998) as a councilman on the City Council of Lake City.  (Doc. 34-12, Bowden Dep., pp. 34-37).  Bowden also served intermittently as the President of the Columbia County Chapter of the National Association for the Advancement of Colored People (NAACP) from 1980 through 2002.  (Id. at pp. 41-43).  This includes a continuous 10 year period from 1980 to 1990.  (Id. at p. 43).

The Lake City seal includes a Confederate flag.  The NAACP had planned a protest against the seal to occur on February 16, 2002, during Lake City's annual re-enactment of the Battle of Olustee.  The day before, February 15, 2002, Bowden was distributing handbills promoting the protest and was stapling these handbills to telephone and utility poles in Northeast Lake City.  (Id. at pp. 49-50).  On or about that

same day, Larry Lee, the Lake City Growth Management Office Director, noticed a large number of signs posted to utility poles throughout the City.  (Doc. 34-6, Lee Aff., ¶ 5).  Because Lake City did not have a city code enforcement board at the time, the Growth Management Office (GMO) was in charge of code enforcement.  (Id. at ¶ 2).  It was Lee and his staff's job to enforce city ordinances.  (Id.).  If the GMO required assistance with code enforcement, Lee obtained assistance from the Lake City Police Department (LCPD).  (Id.).

On February 15, 2002, Lee addressed his staff and asked that they take down the signs and ascertain the identity of the individual posting the signs.  (Id. at ¶ 5).  Lee states that he was not concerned with the content of the signs (and does not recall if he even knew the content at that time); he asked his staff to locate and remove the signs, which were many in number.  (Id.).  Two code enforcement officers, Bill Black and Troy Crews, had also seen the handbills and witnessed Bowden posting them.  (Doc. 34-3, Black Aff. ¶ 4-5; Doc. 34-4, Crews Aff., ¶ 3).  Crews and Black informed Lee that Bowden was posting the handbills.  (Id.).  When Crews and Black saw Bowden posting the handbills, they did not stop their car or speak with Bowden about his activity.  (Black Aff., ¶ 4).

Lee then called the LCPD and reported that Bowden was violating City Ordinance 66-11, which states:

> It shall be unlawful to attach posters or handbills to, or to cut, scratch or otherwise disfigure any telegraph, telephone, electric light, signal or other pole or gas post standing in the street.

-3-

(Lee Aff., ¶ 5; Doc. 34-11).  Shortly thereafter, Chief Allbritton learned that Bowden was posting the handbills.[2]  (Doc. 34-2, Allbritton Aff., ¶ 9).  Chief Allbritton contacted dispatch and told them to send an officer to survey the situation.  (Id.).  Chief Allbritton did not tell dispatch the identity of Bowden in the event the information he received was incorrect; he merely told dispatch that an African American male was reported to be posting items on utility poles.  (Id.).  Chief Allbritton also contacted the patrol lieutenant, Lt. Debra Moody[3], and arranged for her to obtain a copy of the ordinance to provide to the officer who went to the scene so that he or she could show it to Bowden.  (Id. at ¶ 10).

Lieutenant Moody provided a copy of the ordinance to Officers Tim Murphy and Craig Strickland, who were dispatched to the area where Bowden was seen posting the signs.[4]  (Doc. 34-8, Murphy Aff., ¶ 2; Doc. 34-10, Strickland Aff., ¶ 3).  Officers Strickland and Murphy first observed Bowden between 9:30 and 10:00 a.m. in the Washington Street area in Northeast Lake City.  (Bowden Dep., pp. 49-50; Murphy Aff., ¶ 4).  During a polite conversation, the officers told Bowden that he was violating

---

[2]    Chief Allbritton does not recall if he spoke with Larry Lee directly or if someone else notified him of the situation.  (Allbritton Aff., ¶ 9).

[3]    Lieutenant Moody is retired from the LCPD and is now known as Debra Moody Miller.

[4]    Officer Murphy was field training Officer Strickland on February 15, 2002.  He was riding with Officer Strickland to mark his progress as a new officer.  (Murphy Aff., ¶ 3).

-4-

Ordinance 66-11 by posting his flyers on the telephone poles.  Officer Strickland read the ordinance to Bowden, Bowden said he understood it, and the officers left understanding that it was Bowden's intent to comply with the ordinance.  (Bowden Dep., p. 50; Murphy Aff., ¶ 4; Strickland Aff., ¶ 3).

After this stop, Officer Murphy contacted Lieutenant Moody and advised her of what had occurred and that the individual posting the signs was former councilman Bowden, who Murphy presumed was familiar with the ordinance.  (Murphy Aff., ¶ 5).  Officers Murphy and Strickland received no further instruction from Lieutenant Moody at that time.  They were not told to continue monitoring Bowden or to try to catch him in the act.  (Id. at ¶ 6).

Shortly thereafter, Officer Murphy asked Lieutenant Moody what he and Officer Strickland should do if they later observed Bowden posting flyers during their general patrol.  (Id.).  After obtaining advice from the State Attorney's Office in Lake City at the direction of Chief Allbritton, Lieutenant Moody told Officers Murphy and Strickland that if they observed Bowden posting additional signs that they could issue him a notice to appear in court.  (Moody Aff., ¶ 5).

At about 3:30 p.m. that same day, Officers Murphy and Strickland, while on their normal patrol, saw Bowden posting additional signs on telephone poles at the corner of Broadway and St. Clair.  (Murphy Aff., ¶ 7; Strickland Aff., ¶ 5).  Officer Strickland read the ordinance again to Bowden and then issued Bowden a notice to appear in court consistent with what Lieutenant Moody had advised.  (Id.).  The time

-5-

of issuance on the notice is 3:45 p.m. and the notice reflects that it was issued due to a violation of Municipal Code 66-11 for "posting bills to utility poles." (Murphy Aff., Ex. C).

Bowden testified that this interaction was again polite and that the officers were not disrespectful to him in any manner. (Bowden Dep., pp. 52-53). Bowden stopped placing the flyers on the telephone poles and began walking to his car, which was parked a few blocks away. (Id. at pp. 53). After Bowden had walked a couple of blocks, Officers Murphy and Strickland approached him again and told him that not only did they want him to stop putting up flyers, they wanted him to go back and take down the flyers he had put up. (Id. at pp. 53-54). At that time, Bowden was walking down the street, not putting up additional flyers.[5] (Id. at p. 53).

Bowden, feeling as if he was being harassed at that point, turned to the officers and said, "I see what direction this is heading, let's just take it to its final end," and posted another flyer in front of the officers on a telephone pole. (Id. at p. 54; Murphy

---

[5]    While the officers' and Bowden's versions of the interactions between them are largely the same, those accounts diverge at this point. Officers Murphy and Strickland contend that after the second stop, they left the area (and did not follow Bowden) and saw him ten to fifteen minutes later posting additional flyers on telephone poles near Martin Luther King Boulevard and Coronado Street in the same area of Lake City. (Murphy Aff., ¶ 8; Strickland Aff., ¶ 6). At that point, Officer Murphy issued Bowden another citation for attaching posters to utility poles. (Murphy Aff., Ex. D). The time stamp on this citation is 4:08 p.m., twenty-two minutes after the time on the initial notice (3:45 p.m.). (Murphy Aff., Exs. C & D). However, while a factfinder could indeed determine that Officers Murphy and Strickland did not "follow" Bowden after the second stop, the Court assumes that they did for summary judgment purposes as it is required to view the evidence in the light most favorable to Mr. Bowden.

Aff., ¶ 8; Strickland Aff., ¶ 6).  Officer Murphy contacted Lieutenant Moody and informed her that Bowden had just posted a flyer in front of them.  (Murphy Aff., ¶ 8).  Lieutenant Moody, based on advice she had received from the State Attorney's Office, told Officers Murphy and Strickland to arrest Bowden.  (Moody Aff., ¶ 7).

Approximately ten to fifteen minutes passed from when Officer Murphy called Lieutenant Moody and when he received the order to arrest Bowden.  (Bowden Dep., p. 54).  During that time, Lieutenant Moody reported to Chief Allbritton that Bowden had just stapled a flyer in front of the officers during their third encounter and that she had received advice from an Assistant State Attorney that if Bowden posted a flyer in the presence of the officers that the officers could arrest him.  (Moody Aff., ¶ 7).  Based on the information Lieutenant Moody relayed to Chief Allbritton, Chief Allbritton made the decision to arrest Bowden.  (Allbritton Aff., ¶ 13).

Officers Murphy and Strickland transported Bowden to the Columbia County Jail where he was booked and charged with violating City Ordinance 66-11 and resisting an officer without violence in violation of Fla. Stat. § 843.02.  (Bowden Dep., pp. 55-56; Doc. 34-11).   Bowden opted not to pay the bond ($1,000 for each misdemeanor offense) because he anticipated being released on his own recognizance the next morning during his first appearance in court, which is precisely what occurred.  (Doc. 34-11; Bowden Dep., pp. 56-57).  On March 14, 2002, the State Attorney's Office filed documents titled "No Information Filed" and "Notice of Nolle Prosequi/Prosecution Decline" in Bowden's criminal case file declining to prosecute

-7-

the Section 66-11 offense because the ordinance against posting handbills on utility

or other poles "standing in the street" was void for vagueness due to the inclusion of

the quoted language.  (Doc. 34-11).  The State Attorney's Office also declined to

prosecute the section 843.02 resisting without violence offense because it was

"problematic" in view of the facial invalidity to Ordinance section 66-11.  (Id.).

### B.    Enforcement of Ordinance 66-11

GMO Director Lee and code enforcement officers Crews and Black state that

pursuant to Lake City's anti-handbill ordinance (Ordinance 66-11), one of their tasks

was to remove signs from utility poles throughout the city.  (Id. at ¶ 4; Black Aff., ¶ 2;

Crews Aff., ¶ 2).  According to Lee, he has directed the removal of posted handbills

that have covered all types of events, including "high school functions, church events,

weight watcher programs, realty signs that are not located on the property to be sold,

and yard sale signs."   (Lee Aff., ¶¶ 2, 4, 12).   If Lee knew the identity of the

individual(s) posting the signs, his department would call to inform them that they

were violating a city ordinance by erecting the handbills and ask them to cease doing

so. (Id. at ¶ 10). In 2002, though the GMO was tasked with enforcing city ordinances

and periodically requested the LCPD's assistance with code enforcement, the LCPD

did not undertake code enforcement on a daily basis. (Lee Aff., ¶ 2; Dubose Dep.,

p. 7, lines 9-18).[6]

---

[6]    In his response to defendants' motion for summary judgment, Bowden quoted
portions of the depositions of Captain John Dubose, Chief Allbritton and Officers Tim

Chief Allbritton states that from time to time his department would discuss ordinance enforcement with its officers, including handbill and sign ordinance violations and how to handle such. (Allbritton Aff., ¶ 5). Specifically, as to violations of Ordinance 66-11, if the officer could determine the identity of the individual who posted the handbills, the officer was to contact that person and inform him or her that posting handbills was a city ordinance violation and to cease such activity. (Id.). Before the arrest of Bowden, Chief Allbritton knew of no individual who refused to comply with the anti-handbill ordinance after having been apprised of its existence. (Id.). LCPD Captain John Dubose and Lieutenant Moody likewise had never encountered a situation where an individual refused to comply with a request to cease posting handbills. (Dubose Aff., ¶ 6; Moody Aff., ¶ 11).

## II.  APPLICABLE STANDARD

Summary judgment is proper where "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "The burden of demonstrating the satisfaction of this standard lies with the movant, who must present pleadings, depositions, answers to

---

Murphy and Craig Strickland. However, Bowden did not file any of these deposition transcripts along with his response to the motion although he did subsequently file a few pages of Strickland's deposition (Doc. 44-2), which the Court reviewed. Thus, while the Court considered the quoted portions set forth in the response (and the additional pages from Strickland's deposition), it could not consider any other testimony contained in those depositions. The Court also reviewed the full deposition transcripts of Lieutenant Rudolph Davis, LCPD, and Officer Eddie Black, LCPD, that Bowden later filed. (Doc. 43).

interrogatories, and admissions on file, together with the affidavits, if any, that establish the absence of any genuine material, factual dispute." Branche v. Airtran Airways, Inc., 342 F.3d 1248, 1252-53 (11th Cir. 2003) (internal quotations omitted). An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-250 (1986). In determining whether summary judgment is appropriate, a court must draw inferences from the evidence in the light most favorable to the nonmovant and resolve all reasonable doubts in that party's favor. Centurion Air Cargo, Inc. v. United Parcel Serv. Co., 420 F.3d 1146, 1149 (11th Cir. 2005).

## III.   DISCUSSION

### A.     § 1983 Claims Against Lake City and Chief Allbritton (Counts I - IV)

#### 1.     Qualified Immunity for Chief Allbritton - Counts II and IV

Chief Allbritton is entitled to qualified immunity on Counts II and IV in the Third Amended Complaint against him in his individual capacity. Those claims allege that Chief Allbritton ordered Bowden's arrest because of the content of his flyers, promoting the NAACP rally (Count II), and because of Bowden's race, African American (Count IV).

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights

of which a reasonable person would have known." Davis v. Williams, 451 F.3d 759, 762 (11th Cir. 2006) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Because Chief Allbritton was engaged in a discretionary function, i.e., the direction of the arrest of Bowden, who violated a city ordinance in the presence of two officers, the burden shifts to Bowden to show that qualified immunity is inappropriate. Id.

At this point, as set forth in Saucier v. Katz, 533 U.S. 194, 201 (2001), a two-part inquiry applies to the issue of qualified immunity. The first inquiry is "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry." Id. "If, assuming the plaintiff's allegations were true, no such right would have been violated, the analysis is complete. However, if a constitutional violation can be made out on the plaintiff's facts, we then must determine 'whether, at the time of the incident, every objectively reasonable police officer would have realized the acts violated already clearly established federal law.'" Davis, 451 F.3d at 762 (citing Saucier, 533 U.S. at 201-02) (other citation omitted). "Although the first and second inquiries are logically related, the two inquiries must be conducted in the proper order. We may not assume an answer to the first question to avoid difficult constitutional issues." Skop v. City of Atlanta, GA, 485 F.3d 1130, 1137 (11th Cir. 2007) (internal citation and quotation omitted).

The first inquiry is thus whether Chief Allbritton violated Bowden's constitutional rights when he ordered Bowden's arrest for a violation of Ordinance 66-11, which

plaintiff claims is rarely enforced and has never previously been the basis of an arrest.  While it is true that Chief Allbritton was familiar with Bowden (and thus his race) due to Bowden's long public service on the Lake City City Council, Bowden procured no evidence that Chief Allbritton ordered the arrest because of his race. Bowden merely supposes as much without pointing to evidence (direct or circumstantial) to support this assertion.

That Bowden may have been the first arrested under Ordinance 66-11 does not itself show discriminatory animus.  Chief Allbritton and Lieutenant Moody both state that they know of no other individuals who, upon being informed to stop posting handbills in violation of the ordinance, refused to do so and then proceeded to violate the ordinance in the presence of law enforcement.  Thus, simply because Bowden may have been the first arrested for posting handbills in front of an officer does not mean he was impermissibly targeted.  There is no evidence suggesting that Chief Allbritton targeted him because of his race; thus there is no violation of the Fourteenth Amendment's Equal Protection Clause.

This analysis likewise applies to the alleged constitutional violation based on the content of the handbills.  Nowhere does Bowden establish that Chief Allbritton even knew of the handbill's content prior to the arrest.  As the Supreme Court delineated in Saucier, at this phase of the qualified immunity analysis, Bowden bears the burden to establish the alleged First Amendment violation.  As a matter of law, Bowden fails to carry his burden of showing that he was targeted based on the

-12-

political content of the handbills.

Moreover, notwithstanding Bowden's various references to Ordinance 66-11 being unconstitutionally vague (see Doc. 24, Third Amended Complaint; Doc. 37, Response to Summary Judgment), Bowden does not make this the gravamen of his § 1983 claims.  Instead, Counts I through IV are claims that Ordinance 66-11 was selectively enforced against Bowden because of his race and because of the content of the handbills.  However, even if Bowden was asserting that the arrest violated his constitutional rights because it was effected pursuant to an unconstitutionally vague ordinance, Chief Allbritton nevertheless would maintain his qualified immunity.

"In the context of a claim of false arrest, an officer is entitled to qualified immunity where that officer had 'arguable probable cause,' that is, where reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest the plaintiff." Davis, 451 F.3d at 762-63 (citing Kingsland v. City of Miami, 382 F.3d 1220, 1232 (11th Cir. 2004)) (internal citation and quotation omitted).  To determine if "arguable probable cause" exists, courts look at the totality of the circumstances, construing the facts in the light most favorable to the plaintiff.  Davis, 451 F.3d at 763.

Here, Chief Allbritton not only had arguable probable cause to order the arrest, he had probable cause pursuant to Fla. Stat. § 901.15(1)[7], as the offenses were

---

[7]    Fla. Stat. § 901.15(1) provides that an officer may make a warrantless arrest for the commission of a misdemeanor or the violation of a municipal ordinance when

committed in the presence of Officers Murphy and Strickland.  See Lee v. Ferraro, 284 F.3d 1188, 1196 (11th Cir. 2002) ("[w]hen an officer lawfully arrests an individual for the commission of a crime, no matter how minor the offense, the officer is entitled under controlling Supreme Court precedent to effectuate a full custodial arrest") (citing Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001)).  It is undisputed that during the third interaction with Officers Murphy and Strickland, which occurred almost seven hours after the first earlier that morning, Bowden stapled a handbill to a telephone poll in their presence.  Officers Murphy and Strickland had even read the ordinance to Bowden twice during their three encounters.  In fact, all involved in the chain of command (Officers Murphy and Strickland, Lieutenant Moody and Chief Allbritton) appeared to go to great lengths to avoid arresting Bowden.

That the State Attorney's Office later declined to prosecute on the ground that Section 66-11 was unconstitutionally vague is of no moment here.  Assuming arguendo that Section 66-11 is unconstitutionally vague, it had not been so declared at the time of arrest and Chief Allbritton had probable cause to believe that Bowden had violated the ordinance based on the information he received.  See Michigan v. DeFillippo, 443 U.S. 31, 37-38 (1979) (refusing to invalidate an arrest and search because probable cause existed and the officer had no reason to know that the ordinance supporting the arrest would later be declared unconstitutional); Cooper v.

---

such an infraction occurs in the presence of the officer.

Dillon, 403 F.3d 1208, 1220-21 (11th Cir. 2005) (police chief entitled to qualified immunity because he was acting within his discretionary authority when he obtained an arrest warrant and arrested a newspaper reporter for violation of a state statute, later declared content based and unconstitutional) (citations omitted); Lee, 284 F.3d at 1196, n. 4 (even if a Miami-Dade anti-honking ordinance conflicted with the Florida anti-honking statute, and thus was invalid, the arresting officer had reason to believe that the ordinance had been violated and to effect a custodial arrest) (citation omitted).

The arrest in this case was lawful.  Bowden cannot make the required showing under the qualified immunity analysis that Chief Allbritton did not have arguable probable cause to order the arrest or that he violated any of Bowden's constitutional rights.  Chief Allbritton is entitled to qualified immunity on the claims against him in his individual capacity and thus is entitled to a summary judgment on Counts II and IV in the Third Amended Complaint.[8]

## 2.     Lake City's Direct Liability - Counts I and III

To impose § 1983 liability on a municipality, a plaintiff must show: "1) that his constitutional rights were violated; 2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and 3) that the policy or custom caused the violation."  McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing City of Canton v. Harris, 489 U.S. 378, 388 (1989)).  Municipalities and

---

[8]The Court need not address the "clearly established" part of the qualified immunity analysis.

local governments are only subject to § 1983 liability if their official policies directly caused a constitutional deprivation.  Campbell v. Rainbow City, Ala., 434 F.3d 1306, 1312 (11th Cir. 2006).   "A policy is a decision that is officially adopted by the municipality. . . .  A custom is a practice that is so settled and permanent that it takes on the force of law."  Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir. 1997) (citation omitted).  Under appropriate circumstances, municipal liability may be imposed for a single decision by municipal policymakers.  Id. (citing Pembaur, 475 U.S. at 480).   However, an inquiry into a governmental entity's custom or policy becomes relevant only when there is a constitutional deprivation.  Rooney v. Watson, 101 F.3d 1378, 1381-82 (11th Cir. 1996).

Bowden's selective enforcement claims fail under this threshold question of whether he suffered a deprivation of his constitutional rights.  As set forth above, Bowden asserts that Lake City violated his First Amendment rights when Chief Allbritton selectively enforced Ordinance 66-11 and ordered his arrest because of the content of his handbills and violated his Fourteenth Amendment rights because Chief Allbritton ordered his arrest on account of his race.

The critical undisputed fact is that Officers Murphy and Strickland gave Bowden three chances to cease posting his handbills before his arrest.  Whether or not it is true that the LCPD has never arrested anyone for a violation of Ordinance 66-11 is not controlling.  Bowden has not proffered any evidence that similarly situated individuals of another race and/or with handbills containing different content have refused to

comply with law enforcement's request that they cease posting handbills and then proceeded to post handbills in the physical presence of officers.  It is not enough for Bowden to show sporadic "enforcement" of the ordinance or that he believes LCPD officers have seen other individuals posting handbills over the years but have not arrested them.  Bowden's assertions that the enforcement in this instance was based on discriminatory animus or because of the content of the postings are supposition and insufficient to forestall summary judgment.[9]

Bowden contends that situations where law enforcement had seen individuals violating the ordinance and merely warned them to comply (which the violators did) without providing a notice or citation or effecting an arrest, are essentially the same as Bowden's situation, where Bowden received the same warning and yet continued to post signs resulting in a notice to appear in court (after the second request) and a citation and arrest (after the third request).  To the contrary, the record reveals a marked distinction, illustrating that Officers Murphy and Strickland followed the practice of providing a warning before proceeding any further with a notice to appear in court or an arrest.  No one had ever before refused to stop posting signs; and no

_____

[9]Following oral argument on the summary judgment motion, the Court permitted Bowden to reopen discovery and take some additional depositions, the fruits of which he now contends form a basis to undertake even further wide-ranging discovery, including redeposing certain witnesses.  Having read the pertinent deposition transcripts (Doc. 43) and having heard additional argument from counsel (Doc. 47), the Court disagrees.  Plaintiff's Supplemental Motion for Leave to Re-depose Certain Witnesses and to Depose Additional Witness (Doc. 42) is **DENIED**.

one had ever before posted a sign immediately after receiving warnings not to do so- - and right in front of the officers.  That these provocative actions resulted in an arrest here does not provide Bowden with a cause of action for direct liability.

Moreover, the Eleventh Circuit's decision in Cooper v. Dillon, upon which Bowden relies, is not controlling on these facts.  In Cooper, a publisher of a weekly newspaper (Cooper) published a series of articles reporting that an internal affairs investigator with the Key West Police Department ("KWPD") failed to investigate a complaint filed with the Florida Department of Law Enforcement ("FDLE") that one of KWPD's officers committed perjury during the prosecution of a traffic offense against a Key West citizen.  403 F.3d at 1212, n. 2.  Cooper then filed a formal complaint with FDLE for the investigator's failure to investigate.  Id. at 1212.  Thereafter, Cooper reported the progress of his complaint and the FDLE's response in two additional published articles.  Id.  On the day the second article ran, the KWPD Chief of Police (Dillon) obtained a warrant and arrested Cooper for violations of Florida Statute section 112.533(4), prohibiting a "participant" in an internal police department investigation from willfully disclosing information concerning the investigation before the complaint or action on the proceedings became public record.  Id. at 1212-13.  Cooper's arrest was the first time that Dillon himself had enforced the statute.  Id. at 1222.  The State Attorney declined to prosecute the charge.  Id. at 1213.  Cooper filed a § 1983 suit seeking injunctive and declaratory relief and damages claiming violations of his First, Fourth and Fourteenth Amendment rights, including a theory of liability

-18-

against Dillon in his official capacity (the same as direct liability against the municipality).[10]  Id. at 1221.  The Court determined that the statute at issue was a restriction intended to stifle speech of a particular content in violation of the First Amendment and the governmental interest in enforcing the statute did not pass strict scrutiny.  Id. at 1216, 1222.  Thus, Dillon's decision to arrest Cooper pursuant to an unconstitutional statute constituted a "deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy" in violation of § 1983.  Id. at 1223 (quoting Pembaur, 475 U.S. at 483).

A study of Cooper and the facts of the present case illustrate a critical difference.  In Cooper, the constitutional deprivation arose out of the arrest that was effected under a statute held to be unconstitutionally content based.  Here, by contrast, Counts I (Violation of Free Speech and Association Based on Content of Speech) and III (Racially Selective Enforcement) in the Third Amended Complaint and the arguments set forth in Bowden's response to defendant's motion and presented at the hearing, reveal that Bowden does not claim that his First Amendment rights were violated because Ordinance 66-11 itself is either unconstitutional or unconstitutionally vague.[11]  Instead, Bowden's claim is that the ordinance was

_____

[10]  See McMillian v. Monroe County, Ala., 520 U.S. 781, 785 n. 2 (1997).

[11]While not needing to decide these issues, the Court notes that even if Bowden had directly attacked the constitutionality of the ordinance, unlike the statute in

selectively enforced against him based on his race and/or the content of his handbills, a concept that is distinct from the application of an unconstitutional content-based statute (as occurred in <u>Cooper</u>).  As explained above, these selective enforcement claims are unsupported by the record.  Summary judgment is therefore due to be granted as to Counts I and III.

### B.      State Law Claims Against Lake City - Count V

In Count V, Bowden alleges Florida tort claims for false imprisonment and malicious prosecution.  The elements of a false imprisonment claim are:  (1) the unlawful detention and deprivation of liberty of a person; (2) against that person's will; (3) without legal authority or "color of authority;" and (4) which is unreasonable and unwarranted under the circumstances.  <u>Montejo v. Martin Mem'l Med. Ctr., Inc.</u>, 935 So. 2d 1266, 1268 (Fla. 4th DCA 2006).  In false arrest/imprisonment cases, probable cause is an affirmative defense.  <u>City of St. Petersburg v. Austrino</u>, 898 So. 2d 955, 957 (Fla. 2d DCA 2005); <u>Daniel v. Village of Royal Palm Beach</u>, 889 So. 2d 988, 990 (Fla. 4th DCA 2004).

The elements of a malicious prosecution claim are: (1) the commencement or continuation of an original civil or criminal judicial proceeding; (2) legal causation of

_____

<u>Cooper</u>, Ordinance 66-11 is apparently content-neutral; moreover, while some of its language may be awkward, it is not at all clear that the ordinance is unconstitutionally vague under prevailing standards.  <u>See</u> <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 108-09 (1972); <u>DA Mortg., Inc. v. City of Miami Beach</u>, 486 F.3d 1254, 1270-71 (11th Cir. 2007).

the prosecution by the present defendant against the plaintiff; (3) the bona fide termination of the original proceeding in favor of the plaintiff; (4) the absence of probable cause for prosecution of such proceeding; (5) the presence of malice; and (6) damages resulting to the plaintiff. Alamo Rent-A-Car, Inc. v. Mancusi, 632 So. 2d 1352, 1355 (Fla. 1994). Assuming the remaining elements of a malicious prosecution claim are fulfilled, an arrest without further prosecution can constitute a basis for malicious prosecution. Levine v. Hunt, 932 So. 2d 1292, 1293 (Fla. 2d DCA 2006). However, a plaintiff must affirmatively show a lack of probable cause to establish his or her malicious prosecution claim. Daniel, 889 So. 2d at 990.

As discussed above in section III.A.1, the undisputed facts show that LCPD had probable cause to order Bowden's arrest, thus negating any false imprisonment or malicious prosecution claim. Summary judgment is due to be entered in favor of Lake City on Count V.

## IV.    CONCLUSION

The Court understands the potential racial and political sensitivities raised by this case. However, a court can only consider facts and law, not sensitivities, supposition or surmisal. If plaintiff had brought forward evidence that he had been singled out because of his race or because of the political content of his handbills, the protections of the Constitution would be properly invoked. However, the dearth of such evidence means that the Court must grant summary judgment. Accordingly, it is hereby

**ORDERED**:

Defendants City of Lake City and David Allbritton's Motion for Summary Judgment (Doc. 33) is **GRANTED**.  The Clerk shall enter judgment in favor of the defendants and against the plaintiff and close the file.

**DONE AND ORDERED** at Jacksonville, Florida this 17th day of December, 2007.

TIMOTHY J. CORRIGAN
United States District Judge

t/s.

Copies to counsel of record